**NATIONAL STABILIZATION AGREE-MENT OF the SHEET METAL IN-DUSTRY TRUST FUND, et al.,**

v.

**COMMERCIAL ROOFING & SHEET METAL, et al., Appellants.**

Nos. 78–1761, 78–2071.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1980.

Decided May 4, 1981.

William H. DuRoss, III, Washington, D. C., for appellants. Gerard C. Smetana and Burt A. Braverman, Washington, D. C., also entered appearances for appellants.

Harry Huge, Washington, D. C., with whom David R. Boyd and Krista M. Fogleman, Washington, D. C., were on the brief, for appellees.

Before TAMM and MIKVA, Circuit Judges, and PHILIP NICHOLS, Jr.,* Judge, United States Court of Claims.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this case we must determine whether the alleged existence of certain "structural defects" in a joint labor-management trust fund constitutes an adequate defense to a collection suit for delinquent contributions brought under section 502 of the Employee Retirement Income and Security Act (ERISA), 29 U.S.C. § 1132 (1976). The National Stabilization Agreement of the Sheet Metal Industry Trust Fund (SASMI) and its trustees initiated this action in the District Court for the District of Columbia for employer contributions due under a collective bargaining agreement between various labor organizations representing sheet metal workers and appellants, members of the Central Florida Sheet Metal Contractors Association, Inc. (CFSMCA or the Association). Appellants contended in the district court that their contractual obligation was unenforceable because the trust fund violated the "equal representation" requirement of section 302(c)(5)(B) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5)(B) (Supp. II 1978). District Judge June L. Green rejected this contention, however, holding, *inter alia*, that an equal representation argument is an insufficient defense to an ERISA claim. Accordingly, she granted plaintiffs' motion for summary judgment and denied defendants' cross-motion for summary judgment. She also awarded plaintiffs attorney's fees pursuant to section 502(g) of ERISA, 29 U.S.C.

§ 1132(g) (1976). We agree with Judge Green that a remedy exonerating defendant-appellants from their contractual obligation is inappropriately broad in these circumstances and find that her award of attorney's fees in this case was reasonable. We therefore affirm her decision.

## I. BACKGROUND

### A. *SASMI and the 1974 Agreement*

SASMI is a comprehensive supplemental employment compensation plan developed in 1973 to encourage maximum employment in the sheet metal industry and to minimize the hardships workers endure in periods of less than full employment. As conceived, the plan sought a rough approximation in disposable income between union workers who were fully employed and those unemployed for a major portion of the year due to local economic conditions. Economic assistance in the form of four types of benefits was to be provided to those deemed underemployed. Funding was to be obtained from sheet metal contractors agreeing to SASMI's incorporation into local collective bargaining agreements. *Sheet Metal Workers' International Association*, 234 N.L.R.B. 1238, 1239 (1978), *appeal docketed*, No. 79-2396 (5th Cir. June 12, 1979).

In July 1974, representatives of Local 493 demanded that the Association agree to SASMI's incorporation into the collective bargaining agreement then under negotiation. When the Association rejected this demand, and protracted bargaining produced no consensus, the Local and the Sheet Metal Workers' International Association (SMWIA) initiated a strike against CFSMCA members. The Association then acquiesced in SASMI's inclusion, and the parties concluded in October 1974 a contract in which Association members agreed to make monthly payments into the SASMI fund beginning in August 1976.

This apparent resolution of the SASMI dispute was, however, merely temporary. Dissatisfaction with the agreement and the

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

obligations it imposed prompted the Association to file unfair labor practice charges against the SMWIA and Local 493, and to pay the sums into an escrow account rather than into the SASMI fund. The unfair labor practice charges were ultimately resolved by the National Labor Relations Board (Board or NLRB), and its decision is presently on appeal, *Sheet Metal Workers' International Association*, 234 N.L.R.B. 1238, 1239 (1978), *appeal docketed*, No. 79–2396 (5th Cir. June 12, 1979);[1] the refusal to pay prompted the fund and its trustees to bring the suit presented here on appeal.

### B. *The District Court Decision*

In October 1976, plaintiffs filed a complaint in the District Court for the District of Columbia, requesting that defendants be restrained from refusing to pay the amounts due the SASMI fund under the 1974 collective bargaining agreement; to this complaint defendants filed neither answer nor counterclaim. Thereafter plaintiffs moved for summary judgment. Defendants responded with a cross-motion for summary judgment[2] in which they alleged that the contract obligations were unenforceable because the administrative structure of the trust did not conform to the

equal representation requirement of section 302(c)(5)(B) of the LMRA, and because the trust fund authorization payments for incentive and travel benefits violated section 302(c)(5)(A).[3] Defendants argued that these violations rendered SASMI a nonmandatory subject of bargaining for which coercive strike pressure could not be utilized. The strike initiated by SMWIA and the Local to compel the Association's acceptance of SASMI was, therefore, an unfair labor practice which vitiated the payment obligations of CFSMCA members under the 1974 agreement.

District Judge June L. Green declined, however, to assess the structure of SASMI in light of the requirements of section 302(c). Instead, she noted, the suit before the court was a collection action; defendants had not requested, by answer or counterclaim, that the court exercise its jurisdiction under section 302(e)[4] to "restrain violations" of section 302(c)(5). Therefore, defendants' allegations could be evaluated only with regard to their sufficiency as a defense to plaintiffs' ERISA claim. After considering defendants' allegations in that posture, Judge Green found them inadequate to sustain the grant of relief afforded

1. Although originally docketed in the United States Court of Appeals for the Fifth Circuit, this case was recently transferred to the newly created Eleventh Circuit.

2. Defendants' motion was actually entitled "Motion to Dismiss or Stay Proceedings or in the Alternative for Summary Judgment." Judge Green denied the motion as one for summary judgment, and we will refer to it as such in this opinion.

3. The statute provides in relevant part:
   (c) The provisions of this section shall not be applicable
   ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided*, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or

hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, . . . .
29 U.S.C. § 186(c) (Supp. II 1978).

4. Section 302(e) states:
   (e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of Title 28 (relating to notice to opposite party) to restrain violations of this section, without regard to the provisions of section 17 of Title 15 and section 52 of this title, and the provisions of chapter 6 of this title.
29 U.S.C. § 186(e) (Supp. II 1978).

by summary judgment. Accordingly, she denied defendants' motion for summary judgment and granted that of plaintiffs. *National Stabilization Agreement of the Sheet Metal Industry Trust Fund v. Anning-Johnson, Co.*, No. 76–1957 (D.D.C., filed May 31, 1978), Joint Appendix (J.A.) at 1–6.

The district judge justified her decision on four grounds. First, she found "no statutory or decisional authorities to justify the notion that a commitment under an otherwise valid collective bargaining contract between labor and management to make certain payments to a welfare and benefits trust fund should be set aside because of violations of the equal representation clause." J.A. at 4. Second, she believed that the relief provided defendants by summary judgment—"total absolution" from their contractual obligations—was inappropriately drastic. Even if the court were to find the trustee selection method for SASMI in violation of section 302 requirements, it would not "use its equitable power to excuse defendants from making their payments." *Id.* Third, payment avoidance could not be justified as a proper exercise of a district court's section 302(e) authority to restrain violations. This authority is equitable in nature, the district judge stated, and a court-ordered abrogation of the 1974 contract is a remedy which lies outside the scope of the court's equitable powers. Moreover, a grant of such relief in this case would be particularly inappropriate since the NLRB had ruled that the SASMI fund and the precedent union activity were not invalid as a matter of labor law. J.A. at 4–5. Finally, the district judge ruled that these defendants had waived their right to raise the equal representation question on the ground that the NLRB had determined the SASMI provision and the strike initiated to induce its acceptance to be permissible incidents of bargaining. Because defendants had entered into a collective bargaining agreement, upheld in relevant part by the NLRB, they were estopped from asserting the same alleged statutory noncompliance as a defense to the collection suit. J.A. at 5. All of these reasons or, indeed, any of them, Judge Green concluded, supported her disposition of the parties' motions.[5] J.A. at 6.

Following this decision, plaintiffs moved for, and were granted, attorney's fees and expenses. J.A. at 8. Defendants subsequently filed this timely appeal.

## II. DISCUSSION

### A. Appellants' Contentions

Appellants seek relief in this court on two grounds. First, appellants contend that because the SASMI plan did not provide for the Association's direct selection of management trustees for the SASMI fund, labor's strike to compel SASMI's acceptance was essentially coercion of the Association's selection of its collective bargaining representatives. Such coercion is an unfair labor practice under section 8(b)(1)(B) of the LMRA, 29 U.S.C. § 158(b)(1)(B) (1976), and would invalidate any collective bargaining agreement resulting from such practice. Invalidation of that agreement would, in turn, render unenforceable the payment obligations it imposes. Accordingly, appellants urge us to determine that the trustees of the SASMI fund are representatives of their appointing parties, and to reverse the district court on that basis.

In the alternative, appellants request that we remand the case to the district court for a determination of their equal representation claim. They assert that the district court erroneously declined to exercise its power to evaluate alleged violations of section 302(c)(5) requirements. They contend that the scope of the enforcement sections of ERISA must be construed consistently with the federal law developed in the collection of actions initiated pursuant to section 302 of the LMRA. Under that law, appel-

---

**5.** On the basis of the remedy and waiver considerations, Judge Green also held that plaintiffs' section 302(c)(5)(A) allegations could not constitute an adequate defense to plaintiffs' claim, "whether or not ... considered in tandem with defendants' primary claim." J.A. at 6.

lants state, "it [is] well settled that delinquent contributors [can] raise defenses directly related to the structure of the trust fund." Brief for Appellants at 16. Where such defenses actually establish the structural defects they allege, moreover, appellants argue that courts have consistently held that employers have a statutory duty to refrain from making contributions. The district court's failure to heed this pre-ERISA law, appellants contend, requires this court to reverse and remand for proper consideration of their section 302 defenses.

Appellants' final challenge is directed toward the district court's award of attorney's fees. They argue that this case presents an issue of first impression for this court, and that an award of fees in such circumstances is an abuse of discretion. They further assert that the award cannot be premised upon the obligation imposed by an illegal trust agreement and that, in any event, such an award is improper here because SASMI's expenses are "self-inflicted." Reply Brief for Appellants at 5 n.4.

**B.  *Separating the Wheat from the Chaff: Issues and Non-Issues***

We believe an examination of appellants' contentions makes a preliminary statement imperative. Before addressing the issues presented in this case, therefore, we state briefly what is *not* at issue here. Initially, we must decline appellants' invitation to determine whether trustees of the SASMI fund are collective bargaining representatives of their respective appointing parties within the meaning of section 8(b)(1)(B) of the NLRA. Despite appellants' generous grant of jurisdiction we may not decide a question that is not before us.

In charges filed before the Board, the Association pressed its argument that the trustee selection clause made the strike activity of SMWIA and the Local coercive because trustees are collective bargaining representatives for section 8(b)(1)(B) purposes. The Board, however, rejected this argument. It found that the primary function of the SASMI trustees was the administration of the SASMI trust agreement

rather than the conduct of collective bargaining negotiations, and that such trustees are required to act solely in the interests of the beneficiaries of the trust fund. The Board concluded, therefore, that SASMI trustees were not collective bargaining representatives within the meaning of section 8(b)(1)(B). *Sheet Metal Workers' International Association*, 234 N.L.R.B. at 1246–48. This decision, as we noted earlier, was not appealed to this court. Since it was not then offered for our consideration, we will not now presume, in this collateral manner, to exercise jurisdiction over it. Instead, we leave the issue's determination to the court before which it has been properly presented.

Secondly, we believe that appellants have misapprehended the nature of the district court's conclusion. The district judge did not decide that a district court had no jurisdiction over allegations of section 302(c)(5) infirmities. Rather, as she explicitly recognized, J.A. at 4, a district court has express jurisdiction under section 302(e) of the LMRA to "restrain violations" of section 302 requirements. Appellants chose not to invoke that jurisdiction, however, apparently relying upon the alleged equal representation violation as a total defense to SASMI's claim for delinquent contributions. Judge Green determined that this asserted defect was *insufficient* to obviate the Association's contractual obligation; she did not refuse appellants their requested relief on jurisdictional grounds, as they now contend. With these preliminary observations in mind, we turn now to the issues before us.

**C.  *ERISA and LMRA: Their Intersection and Its Application to This Case***

In deciding whether appellants may successfully defend a collection action brought under section 502(a) of ERISA by asserting violations of the structural requirements of section 302(c)(5) of the LMRA, we must first determine whether pre-ERISA decisions interpreting section 302(c)(5) are applicable to an ERISA claim. An examination of ERISA and its legislative history leads us to agree with appellants that this

authority is indeed relevant to the disposition of this case. The pertinent section of the statute, section 514(d), explicitly states that

> [n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under any such law.

29 U.S.C. § 1144(d) (1976). As this court recently held, "this is a strong, comprehensive, express statement that ERISA is not to be read as displacing by implication any pre-existing federal legislation." *Air Line Pilots Association, International v. Northwest Airlines, Inc.*, 627 F.2d 272, 276 (D.C. Cir.1980). The legislative history, moreover, provides additional support for this conclusion. In its discussion of the problems with existing pension legislation, for example, the Senate Committee on Labor and Public Welfare remarked in its Report on the Retirement Income Security for Employees Act of 1973 (the Senate version of the later-enacted ERISA) that

> [t]he Labor-Management Relations Act, Sec. 302, provides the fundamental guidelines for the establishment and operation of pension funds administered jointly by an employer and a union. The Act is not intended to establish nor does it provide standards for the preservation of vested benefits, funding adequacy, security of investment, or fiduciary conduct.
>
> .    .    .    .    .
>
> The proposed bill would [ ] establish minimum standards of vesting, funding, and fiduciary conduct and also provide for voluntary portability of earned pension credits and a system of compulsory benefit insurance to protect the security of pension rights.

S.Rep.No.93–127, 93d Cong., 1st Sess. 4–5 (1973), U.S.Code Cong. & Admin.News 1974, 4639, 4841, *reprinted in* I Legislative History of the Employment Retirement Income and Security Act at 590–91 (1976).

These sources reveal no congressional intent to undermine the validity of existing legislation, or, inferentially, of its construction by the judiciary. Instead, Congress attempted in ERISA to fill those gaps in the worker protection provided by pension funds created pursuant to such legislation. Because, therefore, judicial interpretations of section 302(c)(5) would be plainly relevant to this case had it been initiated prior to ERISA's enactment, and Congress expressly indicated its intent not to disturb existing law, we proceed to an examination of the section 302(c)(5) authority developed by the federal courts.

Under the LMRA, employers are generally forbidden to make *any* payments to representatives of employees. An exception to this general prohibition is provided in section 302(c)(5), the result of a compromise reached between two competing concerns. One concern was that a flat prohibition against employer payments would destroy existing employee welfare funds; the other was that, absent some statutory control, union officials would remain free to abuse the unfettered discretion they then exercised over such funds.[6] Under the compromise, employers were permitted to contribute to those trusts meeting certain requirements specified within the subsection. By thus structuring the exception Congress could assure the continued flow of benefits to employees under existing plans, while at the same time guarding against those abuses it saw arising from exclusive union control of trust funds.

---

6. Senator Ball, who introduced section 302, explained its purpose:

> [T]he sole purpose of the amendment is not to prohibit welfare funds, but to make sure that they are legitimate trust funds, used actually for the specified benefits to the employees of employers who contribute to them, and that they shall not degenerate into bribes.... I myself think that unless we make sure that such funds, when they are established, are really trust funds and are actually used for the benefit to [sic] employees specified in the agreement, there is very grave danger that the funds will be used for the personal gain of union leaders, or for political purposes ... and that they will in fact become rackets.

93 Cong.Rec. 4805 (1947), *reprinted in* II NLRB Legislative History of the Labor Management Relations Act, 1947, at 1305 (1948).

Civil enforcement of the standards established in section 302(c)(5) was provided for in subsection (e). In that subsection Congress granted federal district courts equitable jurisdiction to "restrain violations of this section...." 29 U.S.C. § 186(e) (Supp. II 1978). The federal courts have agreed that this jurisdictional provision permits them to grant parties injunctive [7] and, in some instances, declaratory [8] relief in restraining these violations. Moreover, although the scope of section 302(e) jurisdiction has not yet been fully defined,[9] at least this much is certain:

> a federal district court does have jurisdiction under the section to enforce a trust fund's compliance with the statutory standards set forth in subsection (c)(5) by eliminating those offensive features in the structure or operation of the trust that would cause it to fail to qualify for a (c)(5) exception.

*Associated Contractors of Essex County, Inc. v. Laborers International Union,* 559 F.2d 222, 225 (3d Cir. 1977).

■ Consistent with this interpretation, courts have entertained challenges to the structural validity of a trust fund. Where, as here, these allegations assert that employers and employees are unequally represented in the joint administration of an employee welfare fund, a court will look beyond the equality signified by equal numbers to determine whether the administrative structure reflects "meaningful adherence to the Congressional command." *Id.*

at 227. If it finds that the administration creates the potential for union domination, the court will take the appropriate equitable measures to ensure compliance with the equal representation standard. *See, e. g., id.; Quad City Builders Association v. Tri City Bricklayers Union No. 7,* 431 F.2d 999 (8th Cir. 1970).

Appellants in this case could have followed this well-established procedure in determining the structural validity of the SASMI fund. They could have instituted a suit under section 302(e), requesting the district court to enjoin any existing violations of the structural requirements of section 302(c)(5). Appellants chose, however, to disavow their contractual obligation and to assert their claims of structural defects as justification for this disavowal. When the district court subsequently rejected this attempted justification, appellants filed this appeal, claiming that the district court wrongly ignored the federal common law developed under section 302.

Pausing briefly to observe that appellants are hardly in a comfortable position to accuse anyone of ignoring the relevance of section 302 law, we proceed to an examination of their proposition that under that law "delinquent contributors [can] raise defenses directly related to the structure of the trust fund." Brief for Appellants at 16. To support this proposition, appellants refer us to the cases of *Thomas v. Reading Anthracite Co.,* 264 F.Supp. 339 (M.D.Pa.1966),

---

7. *See, e. g., Quad City Builders Ass'n v. Tri City Bricklayers Union No. 7,* 431 F.2d 999 (8th Cir. 1970); *Employing Plasterers' Ass'n v. Journeymen Plasterers' Protective & Benevolent Society Local 5,* 279 F.2d 92, 97 (7th Cir. 1960).

8. In *Mobile Mechanical Contractors Ass'n v. Carlough,* 566 F.2d 1219 (5th Cir. 1978), *denying rehearing of* 566 F.2d 1213 (5th Cir. 1977), for example, the court stated in its denial of a petition for rehearing that "[w]hether a district court can grant declaratory relief under Section 302(e) jurisdiction depends ... upon whether such relief, under the circumstances, looks to the future or to the past." *Id.* at 1219. The court concluded that section 302(e) jurisdiction was limited to remedies for future violations.

9. Some courts believe that section 302(e) jurisdiction is limited to the adjudication of struc-

tural violations, and does not justify their exercise of jurisdiction over the administration of section 302(c)(5) trusts. *See, e. g., Bowers v. Moreno,* 520 F.2d 843 (1st Cir. 1975); *Fiorelli v. Kelewer,* 339 F.Supp. 796 (E.D.Pa.1972), *aff'd,* 474 F.2d 1340 (3d Cir. 1973). Others have interpreted the jurisdictional grant more liberally. *See, e. g., Burroughs v. Board of Trustees of Pension Trust for Operating Engineers,* 542 F.2d 1128 (9th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977), in which the court held that a district court had jurisdiction under section 302(e) over the alleged failure of trustees to administer a retirement fund in a manner consistent with fundamental due process because such failure was tantamount to a basic structural defect.

and *Ramsey v. United Mine Workers Welfare & Retirement Fund*, 231 F.Supp. 909 (E.D.Tenn.1964); neither case, however, lends credence to appellants' claim. In *Ramsey*, plaintiffs were coal companies seeking to recover payments made to an employees' welfare trust fund established pursuant to a collective bargaining agreement between the plaintiffs and the United Mine Workers of America. As one basis for their requested recovery, plaintiffs argued that the agreement and its accompanying declaration of trust did not sufficiently specify the basis upon which employer contributions would be paid, and therefore violated one of the requirements of section 302(c)(5). The court rejected this argument. Stating that the requirements of subsection (c)(5) should be interpreted as a part of the entire legislative plan, the court concluded that "the establishment of a legally enforcible (sic) method of arriving at a detailed basis for distributing welfare trust funds is sufficient to comply with Section 302(c)(5)," *id.* at 913, and that the challenged agreement provided such a method. Accordingly, the court granted defendants' motion for summary judgment and dismissed the case. We agree with appellants that the *Ramsey* court actually determined the trust fund to be in compliance with the requirements of section 302(c)(5). As we emphasized earlier, however, it is undisputed that a district court may evaluate challenges to the structural validity of a trust fund when such challenges are presented in the proper posture. In *Ramsey, plaintiffs* alleged that the trust fund failed to comply with section 302(c)(5)'s requirements; they did not attempt to defend a collection action brought by the fund on that basis. We do not, therefore, find *Ramsey* particularly helpful to appellants' position.

**10.** We believe the situation presented here differs significantly from that presented by *Bricklayers, Masons and Plasterers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975). There the employer-defendants argued, and the court agreed, that they had no obligation to make contributions to an employer welfare fund where the trust agreement was neither executed nor signed by the defendants.

The *Thomas* case similarly fails to sustain appellants' proposition that section 302(c)(5) violations can be successfully maintained by delinquent contributors defending a collection action. *Thomas*, however, is not irrelevant to our disposition; in fact, it is the only decisional authority which speaks directly to the issue we presently address.[10] In *Thomas*, plaintiffs were trustees of the Anthracite Health and Welfare Fund. They brought suit against the defendant company for royalty payments allegedly owed them under certain Anthracite Wage Agreements. Defendants argued that they could not legally make the promised payments because the fund did not comply with the requirements of section 302. One of the violations they alleged was that employers and employees were not equally represented in the fund's administration. In its assessment of this allegation, the district court reviewed Supreme Court precedent which it felt reflected the Court's overriding concern for the innocent beneficiaries of employee welfare plans. In light of this concern and of the remedy "readily available under Section 302(e)," *id.* at 348, for "situations such as we have here," *id.* at 347, the district court concluded: "the employer's obligation to pay royalties [may not] be diminished by the fact that the plan *adopted by the employer and the Union to receive and administer the Fund* [ ] does not fully qualify with the Act. . . ." *Id.* at 348.

After careful consideration, we find that the circumstances before us merit an application of the *Thomas* court's conclusion. Appellants would have us remand this case to the district court for a thorough assessment of their equal representation claim. If we do not remand or, alternatively, ourselves assess that claim, appellants argue that their complaint will go unheard. In

In making this decision the court remarked that "the policies of the section [302] . . . cannot be accomplished if an employer's duty to make payments arises *in anticipation* of the creation of a trust fund that, as here, may never be created in fact." 512 F.2d at 1028. In this case there is no dispute as to the existence of the fund.

support of this argument, appellants state that the NLRB has refused to determine the merits of their allegation on the ground that the statute requires its adjudication by a district court; that our district court has also refused jurisdiction over the matter; [11] and that the Fifth Circuit, the jurisdiction in which these contractors do business, has in other cases refused to provide the type of declaratory relief appellants seek.[12] Appellants further assert that Congress intended section 302(c) trusts to comply strictly with the requirements specified in subsection (c)(5). They note the criminal penalties to which employers contributing to nonconforming trusts are subject,[13] and point to the acknowledged right of employers to enforce statutory compliance. *See, e. g., Denver Metropolitan Association of Plumbing, Heating, Cooling Contractors v. Journeymen Plumbers & Gas Fitters Local 3 & Pipefitters Local 208*, 586 F.2d 1367, 1372 (10th Cir. 1978); *Blassie v. Kroger Co.*, 345 F.2d 58 (8th Cir. 1965); *Employing Plasterers' Association v. Journeymen Plasterers' Protective & Benevolent Society, Local 5*, 279 F.2d 92, 97–98 (7th Cir. 1960). On the basis of these factors, appellants contend that our failure to ensure proper consideration of their claim would be contrary to the congressional intent underlying the creation of section 302(c)(5) standards.

We disagree. Although strict compliance with the qualifications of section 302(c)(5) is generally required,[14] it is not an end in itself but a means of ensuring that "payments made by employers [are] used to provide employees with the benefits to which they are entitled under a collective bargaining agreement." *Bricklayers, Masons and Plasterers International Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1025 (5th Cir. 1975). To ensure this proper flow of benefits, Congress endowed the federal district courts with the equitable power to restrain violations of section 302(c)(5) requirements. These courts have recognized that their exercise of this power must be consistent with the underlying congressional purpose of protecting trust beneficiaries. Thus, where possible, courts have acted to restrain section 302(c)(5) violations without disturbing the employer's payment obligations.[15]

Equal representation violations seem particularly susceptible of this type of accommodation. Unlike other defects such as the absence of a written agreement, or the absence of a detailed basis for employer payments, an equal representation defect does

---

**11.** We find it necessary to make clear our disagreement with the district court's determination that defendants waived their right to raise the equal representation question because the NLRB found the bargaining agreement to be legal under the NLRA. As the Board rightly determined, and the district court itself recognized, the federal district courts are the proper forum for the adjudication of structural allegations.

**12.** For this last proposition appellants cite *Mobile Mechanical Contractors Ass'n, Inc. v. Carlough*, 566 F.2d 1213 (5th Cir. 1977). In light of our disposition of this case, we find it unnecessary to address this assertion.

**13.** Section 302(d) provides:
> (d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.

29 U.S.C. § 186(d) (1976).

**14.** *See, e. g., Bricklayers, Masons and Plasterers Int'l Union, Local 15 v. Stuart Plastering*

Co., 512 F.2d 1017, 1024–25 (5th Cir. 1975); *Moglia v. Geoghegan*, 403 F.2d 110, 116 (2d Cir. 1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969).

**15.** *See Quad City Builders Ass'n v. Tri City Bricklayers Union No. 7*, 431 F.2d 999 (8th Cir. 1970), discussed at p. 1227 of text *infra*, and *Costello v. Lipsitz*, 547 F.2d 1267, 1278 n.38 (5th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977), in which the court, after declaring that the trust structure violated the equal representation standard of section 302(c)(5), carefully noted:
> Simply because we find that § 10 of the Trust Agreement violates § 302(c)(5)(B), this does not and is not to be construed as a determination that the entire Trust Agreement and Trust Fund structure violate § 302. Section 17 of the Trust Agreement contains a severability provision.... This severability clause and § 10's limited impact—its correction cures the defect—allows the Trust Agreement and Trust Fund to remain.

not practically preclude continued employer contributions.[16] In *Quad City Builders Association v. Tri City Bricklayers Union No. 7*, 431 F.2d 999 (8th Cir. 1970), for example, the court determined that a trust fund in which the employer trustees were appointed by ten mason contractors, eight of whom were active union members who worked occasionally as employees, did not comply with the equal representation requirement. On that basis, the court enjoined the violation and instructed the parties to agree upon a lawful plan for trustee selection. It also held, however, that in the interim preceding election of appropriate trustees, the present trustees could continue to receive contributions to the fund subject to court supervision of disbursements. *Id.* at 1004.

■ We agree that an equal representation violation need not preclude an employer's fulfillment of his contractual obligation. Moreover, we believe that the primacy of protection for trust beneficiaries in the congressional scheme compels the conclusion that appellants may not successfully assert an equal representation defect as a defense to appellees' collection action. In addition to the fact that this conclusion best promotes Congress's interest in a continued flow of benefits, two related factors make this disposition particularly appropriate here: appellants' failure to invoke the well-established forum for the resolution of structural allegations, and the delay in asserting such allegations. As we have been at some pains to point out in this opinion, appellants had, and indeed still have, recourse to the civil preventive remedy provided in section 302(e). The importance of this remedy to employers has been clearly expressed:

> Unilateral termination by the employer-contributors of allegedly illegal contractual obligations may subject them to an action for breach of the collective bar-

gaining agreement. The benefit conferred ... by a test of the legality of the welfare funds and a restraint of violations of Section 302 is the bestowing of legal posture on payments and on the administration of welfare funds and the removal of the onus of participation in a continuing violation which may subject the Association to possible criminal sanctions.

*Employing Plasterers' Association v. Journeymen Plasterers' Protective & Benevolent Society, Local 5*, 279 F.2d 92, 99 (7th Cir. 1960).

Despite the acknowledged importance of this remedy, however, appellants chose not to avail themselves of its benefits—either during the two-year interval between the conclusion of the bargaining agreement and the commencement of the agreed-upon payments, or when the payment obligation matured. They simply breached that obligation. Indeed, only after the trustees of the SASMI fund brought a collection action for the overdue payments did appellants raise their equal representation objection in the district court, and even then the challenge was made in the context of a cross-motion for summary judgment rather than in a separate suit or counterclaim brought pursuant to subsection (e). By thus electing to forego the proper opportunities to resolve their equal representation claim, appellants have created their present distress.[17]

### D. Attorney's Fees

■ We reject appellants' contention that the district court's award of attorney's fees to appellees was improper. Under section 502(g) of ERISA, 29 U.S.C. § 1132(g) (1976), a court may award, in its discretion, a reasonable attorney's fee and costs in any action brought under the Act by a fiduciary, beneficiary, or participant. The SASMI trustees are fiduciaries obligated by ER-

---

16. We believe this same observation holds true as to appellants' section 302(c)(5)(A) allegation and accordingly hold that in the circumstances of this case such an allegation is not an adequate defense to appellees' ERISA action.

17. As the *Thomas* court observed:

> The employer is not relieved of his duty to correct inequities or allegedly illegal facets of the Fund and cannot blandly sit by ... and assert that he has no obligation to honor his contractual commitment....

264 F.Supp. at 348.

ISA to discharge their duties for the purpose of providing benefits to participants and their beneficiaries. *See* 29 U.S.C. § 1104(a)(1)(A) (1976). Pursuant to this obligation these trustees instituted an action to collect overdue employer contributions. The district court exercised its discretion to award the fees and costs attendant to that action, and we can find no abuse of that discretion. *See Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302, 1335 (D.C. Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 2044, 68 L.Ed.2d 347 (1981).

### III. CONCLUSION

Appellants have argued to this court that the congressional interest in strict compliance with the statutory standards of section 302(c)(5) demands that we provide a forum for their equal representation challenges. As we have stated, however, the more significant congressional interest lies in the protection of trust beneficiaries by securing for them the benefits to which they are entitled under a collective bargaining agreement. In this case this interest is appropriately served by our conclusion that appellants' claim of an equal representation defect cannot constitute an adequate defense to appellees' collection action. Moreover, despite appellees' assertion to the contrary, they have not been thereby deprived of a forum for their allegations. Rather, appellants have available to them, as they have had available for the past four years, the long-established remedy specifically provided in subsection (e). Finally, we conclude that the district court properly exercised its authority under ERISA to award attorney's fees. The decision of the district court is therefore

*Affirmed.*